**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **JUSTIN LASECK**, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**USA WASTE-MANAGEMENT RESOURCES, LLC**,<br><br>Defendant. | Case No. 4:26-cv-10054<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Justin Laseck ("Plaintiff"), through his attorneys, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant USA Waste-Management Resources, LLC ("WM" or "Defendant"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiff alleges the following on information and belief—except as to his own actions, counsel's investigations, and facts of public record.

## NATURE OF ACTION

1. This class action arises from Defendant's failure to protect highly sensitive data.

2. Defendant is a subsidiary of Waste Management, Inc. that provides internal corporate and employee services for the WM enterprise, a national provider of waste collection, recycling, disposal, and environmental services. Defendant is headquartered in Houston, Texas.[1]

3. As such, Defendant stores a litany of highly sensitive personally identifiable information ("PII") about its current and former employees. But Defendant lost control over that data when cybercriminals infiltrated its insufficiently protected computer systems in a data breach (the "Data Breach").

4. An unauthorized party had access to Defendant's systems between June 17 and September 3, 2026. Defendant did not detect suspicious activity until September 2, 2026. On information and belief, Defendant lacked effective measures to prevent, detect, stop, or mitigate the unauthorized access—thereby allowing cybercriminals access to its employees' and former employees' PII.

5. On information and belief, cybercriminals were able to breach Defendant's systems because Defendant failed to adequately train its employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's PII. In short, Defendant's failures placed the Class's PII in a vulnerable position—rendering them easy targets for cybercriminals.

6. Plaintiff is a Data Breach victim, having received a breach notice on November 16, 2026. He brings this class action on behalf of himself and all others harmed by Defendant's misconduct.

---

[1] Waste Management, Inc., 2025 Form 10-K, Exhibit 21.1 (subsidiaries), https://www.sec.gov/Archives/edgar/data/823768/000110465926012049/wm-20251231xex21d1.htm (last accessed Nov. 17, 2026).

7. The exposure of one's PII to cybercriminals is a bell that cannot be unrung. Before this data breach, its employees and former employees' private information was exactly that—private. Not anymore. Now, their private information is forever exposed and unsecure.

## PARTIES

8. Plaintiff Justin Laseck is a natural person and a citizen of Pennsylvania. He is domiciled in Albion, Erie County, Pennsylvania, where he intends to remain.

9. Defendant USA Waste-Management Resources, LLC is a limited liability company organized under the laws of New York with its principal place of business at 800 Capitol Street, Suite 3000, Houston, Texas 77002. Defendant is a citizen of New York and Texas for purposes of the Class Action Fairness Act, 28 U.S.C. § 1332(d)(10).[2]

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; the proposed Class consists of at least 100 members; and minimal diversity exists. Plaintiff is a citizen of Pennsylvania, and Defendant is a citizen of New York and Texas for purposes of § 1332(d)(10). The damages and equitable relief sought on behalf of the proposed nationwide Class exceed the jurisdictional threshold in the aggregate. See 28 U.S.C. § 1332(d)(5)(B), (d)(6).

11. This Court also has supplemental jurisdiction under 28 U.S.C. § 1367 over claims that form part of the same case or controversy as claims within its original jurisdiction.

---

[2] USA Waste-Management Resources, LLC, Notice of Data Event to the Iowa Attorney General (Nov. 6, 2026), https://www.iowaattorneygeneral.gov/media/cms/1162026_USA_WasteManagement_Resourc_71065439D4AF1.pdf (last accessed Nov. 17, 2026).

12. This Court has personal jurisdiction over Defendant because its principal place of business is in Houston, Texas, it regularly conducts business in Texas, and it has sufficient minimum contacts with Texas. Defendant is at home in this District.

13. Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (b)(2), and (c)(2) because Defendant resides in this District for venue purposes and a substantial part of the events and omissions giving rise to this action occurred here. On information and belief, Defendant directed the collection, maintenance, and security of the PII at issue from its headquarters in Houston. Houston is within the Houston Division of this District.

## BACKGROUND

***Defendant Collected and Stored the PII of Plaintiff and the Class***

14. Defendant performs corporate and employee-services functions for the WM enterprise, including maintaining confidential information concerning current and former employees. Through those operations, Defendant obtains and stores sensitive employment and identifying information.

15. As part of its business, Defendant receives and maintains the PII of thousands of its employees and former employees.

16. In collecting and maintaining the PII, Defendant agreed it would safeguard the data in accordance with its internal policies, state law, and federal law. After all, Plaintiff and Class Members themselves took reasonable steps to secure their PII.

17. Under state and federal law, businesses like Defendant have duties to protect their employees and former employees' PII and to notify them about breaches.

18. Defendant recognizes its responsibility to safeguard the information entrusted to it. In the public Notice of Data Breach, Defendant stated:

a. “We take our responsibility to safeguard information seriously.”[3]

***Defendant's Data Breach***

19. On September 2, 2026, Defendant detected suspicious activity in its cloud environment. Its investigation determined that an unauthorized party accessed its systems between June 17 and September 3, 2026. On October 6, 2026, Defendant determined that personal information was affected. Defendant subsequently reported that files taken from its environment contained sensitive PII.[4]

20. Worryingly, Defendant admitted that the unauthorized party gained access through “sophisticated social engineering tactics.” On information and belief, reasonable employee training, identity verification, access controls, and monitoring would have prevented or limited that access.[5]

21. Defendant's public notices and regulatory reporting identify the following types of PII in the affected records, with the information varying by individual:[6]

a. Names;

b. Social Security numbers;

c. Dates of birth; and

d. Contact information, including home addresses.

22. Currently, the precise nationwide number of persons injured is unclear. But Defendant reported that the affected information included records relating to more than 522 Iowa

---

[3] USA Waste-Management Resources, LLC, Notice of Data Breach (Nov. 6, 2026), https://oag.ca.gov/system/files/WM%20AG%20Notice%20-%20Consumer%20Notification%20Example%20%28CA%29%20%28Redacted%29.pdf (last accessed Nov. 17, 2026).

[4] Notice of Data Event to the Iowa Attorney General, supra note 2.

[5] Notice of Data Breach, supra note 3.

[6] Notice of Data Event to the Iowa Attorney General, supra note 2.

residents alone. Upon information and belief, the proposed nationwide Class exceeds one hundred members, and its size and membership can be ascertained from information in Defendant's custody and control.[7]

23. And yet, Defendant did not begin mailing breach notices until November 6, 2026—a full 65 days after it detected suspicious activity and 142 days after the unauthorized access began. Plaintiff did not receive his notice until November 16, 2026.

24. Thus, Defendant kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

25. Texas Business and Commerce Code § 521.053(b) requires disclosure of a qualifying breach without unreasonable delay and, subject to statutory exceptions, no later than sixty days after the business determines that the breach occurred. Defendant reported that its notification was not delayed at law enforcement's request. On information and belief, Defendant failed to provide reasonably prompt notice of the exposure.[8]

26. When Defendant did notify affected individuals, it acknowledged the continuing risk of identity theft and fraud, advising recipients to review account statements and monitor their credit reports. It warned affected individuals to:

a. "remain vigilant against incidents of identity theft and fraud."[9]

27. Defendant failed its duties when its inadequate security practices caused the Data Breach. In other words, Defendant's negligence is evidenced by its failure to prevent the Data

---

[7] Id.
[8] Id.
[9] Notice of Data Breach, supra note 3.

Breach and stop cybercriminals from accessing the PII. And thus, Defendant caused widespread injury and damages.

28. Since the breach, Defendant has stated that it investigated the incident, secured the affected environment, and implemented additional safeguards. Those measures should have been implemented before cybercriminals obtained access to the PII.

29. But such simple declarations are insufficient to ensure that Plaintiff's and Class Members' PII will be protected from additional exposure in a subsequent data breach.

30. The public notice does not identify the unauthorized party or fully explain the security deficiencies that permitted the intrusion and how those deficiencies have been corrected. Defendant controls the records and investigation necessary to determine the full scope of the Data Breach.

31. Defendant has offered affected individuals twenty-four months of credit monitoring and identity protection services through Cyberscout. But those temporary services are insufficient to compensate Plaintiff and Class Members for the loss of confidentiality and control over their PII or the long-term risk created by the theft of Social Security numbers.

32. Because of Defendant's Data Breach, the sensitive PII of Plaintiff and Class Members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiff and Class Members.

33. Stunningly, this Data Breach follows an earlier data breach involving Defendant. In 2021, Defendant reported that an unauthorized actor accessed its environment between January 21 and January 23, 2021 and took files containing PII, including Social Security numbers. That

prior incident put Defendant on notice of the need to strengthen its safeguards and prevent another exposure of employee information.[10]

***Cybercriminals & the Dark Web***

34. As explained by the global cybersecurity firm BlackFog, the *modus operandi* of cybercriminals like the perpetrators of the Data Breach is to exfiltrate private information through a data breach and then "post it on forums on the Dark Web where it will be sold for profit."[11]

35. Indeed, the Federal Trade Commission has explained that "data stolen from businesses ends up on the dark web where criminals buy and sell it to commit fraud, get fake identity documents, or fund their criminal organizations."[12]

36. Thus, on information and belief, the PII of Plaintiff and the Class is in the possession of cybercriminals and has been exposed to dissemination, publication, or sale on the Dark Web. The theft of sensitive identifying information creates a continuing risk that it will be monetized and misused.

***Plaintiff's Experiences and Injuries***

37. Plaintiff Justin Laseck is a former employee of Defendant. He worked for Defendant for approximately three and one-half years, until April 2025.

38. Thus, Defendant obtained and maintained Plaintiff's PII.

---

[10] USA Waste-Management Resources, LLC, Notice of Data Event to the Delaware Attorney General (May 28, 2021), https://attorneygeneral.delaware.gov/wp-content/uploads/sites/50/2021/06/WM-Notice-of-Data-Event-DE-Exhibit-1.pdf (last accessed Nov. 17, 2026).

[11] Brenda Robb, After the Data Breach – What Happens to Your Data, BlackFog (July 27, 2025) https://www.blackfog.com/after-the-data-breach-what-happens-to-your-data/.

[12] John Krebs, The dark web: What your business needs to know, Fed. Trade Comm. (Oct. 17, 2017) https://www.ftc.gov/business-guidance/blog/2017/10/dark-web-what-your-business-needs-know.

39. As a result, Plaintiff was injured by Defendant's Data Breach.

40. Plaintiff entrusted his PII to Defendant for limited employment-related purposes. He did not authorize Defendant to disclose or expose his PII to cybercriminals or other unauthorized persons.

41. As a condition of his employment, Plaintiff provided Defendant with his name, date of birth, Social Security number, address, financial information, and contact information. Defendant used that PII to facilitate his employment, including payroll, and required him to provide it to obtain employment and payment for that employment.

42. Plaintiff provided his PII to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

43. Plaintiff reasonably understood that a portion of the funds derived from his employment would be used to pay for adequate cybersecurity and protection of his PII.

44. Plaintiff does not recall ever learning that his information was compromised in a data breach incident—other than the breach at issue here.

45. Plaintiff received a Notice of Data Breach on November 16, 2026. On information and belief, based on that notice and Defendant's public disclosures identifying the affected information, the Data Breach compromised Plaintiff's PII, including his name and Social Security number.

46. On information and belief, Plaintiff's PII is now in the possession of cybercriminals and is exposed to dissemination, publication, or sale on the Dark Web.

47. Through its Data Breach, Defendant compromised Plaintiff's PII.

48. Plaintiff must now devote time and effort to protecting himself against misuse of his PII. Defendant's public notice instructs affected individuals to monitor their accounts and credit reports because of the risks created by the Data Breach.

49. Plaintiff has already spent approximately twenty minutes on a telephone call addressing the Data Breach and seeking assistance concerning his rights and response to the exposure of his information. This is time he would not have spent absent the Data Breach.

50. In the aftermath of the Data Breach, Plaintiff began receiving spam text messages and telephone calls at the same telephone number he had provided to Defendant. On information and belief, the exposure of his PII contributed to those unwanted communications.

51. Plaintiff suffered actual injury from the exposure and theft of his PII—which violates his rights to privacy.

52. Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendant was required to adequately protect.

53. As a former employee, Plaintiff suffered actual injury and lost the "benefit of the bargain" when Plaintiff provided his labor to Defendant in exchange for both payment and reasonable data security for his PII. After all, if Defendant was transparent about its deficient data security, then Plaintiff would have either (1) not worked for Defendant at all, or (2) would have required a salary premium (i.e., a "compensating wage differential") to account for the non-standard risk incurred.[13]

---

[13] Economics has long recognized that "[w]orkers choose a job and receive in return a bundle consisting of income and a probability of [] injury" and that "jobs with disagreeable characteristics command higher wages[.]" Jeff E. Biddle & Gary A. Zarkin, Worker Preference and Market Compensation for Job Risk, 70(4) Rev. Econ. & Stat. (MIT Press) 660, 660–61

54. Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff's PII right in the hands of criminals.

55. Because of the Data Breach, Plaintiff anticipates devoting additional time and resources to monitoring his accounts and taking reasonable measures to protect against identity theft and fraud.

56. Today, Plaintiff has a continuing interest in ensuring that his PII—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Consumers Prioritize Data Security***

57. In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[14] Therein, Cisco reported the following:

a. "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[15]

b. "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[16]

c. 89% of consumers stated that "I care about data privacy."[17]

---

(1988); Robert S. Smith, Compensating Wage Differentials and Public Policy: A Review, 32 Indus. & Labor Rel. Rev. (Cornell Univ.) 339 (1979); Greg J. Duncan & Bertil Holmlund, Was Adam Smith Right After All? Another Test of the Theory of Compensating Wage Differentials, 1 J. Labor Econ. (Univ. Chicago Press) 336, 336–37 (1983).

[14] Privacy Awareness: Consumers Taking Charge to Protect Personal, Cisco, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited March 19, 2025).

[15] Id. at 3.

[16] Id.

[17] Id. at 9.

d. 83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[18]

e. 51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[19]

f. 75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[20]

***Plaintiff and the Proposed Class Suffered Common Injuries and Damages***

58. Because of Defendant's failure to prevent the Data Breach, Plaintiff and Class Members suffered—and will continue to suffer—injuries, including loss of privacy and control over their PII, diminution in its value, and loss of the benefit of their bargain. Plaintiff has also lost time addressing the incident and experienced spam texts and telephone calls. Plaintiff and Class Members suffered or face a substantially increased risk of suffering:

a. loss of the opportunity to control how their PII is used;

b. diminution in value of their PII;

c. compromise and further dissemination of their PII;

d. out-of-pocket costs from trying to prevent, detect, and recover from identity theft and fraud;

e. lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identity theft and fraud;

f. delay in receipt of tax refund monies;

g. unauthorized use of their stolen PII; and

---

[18] Id.
[19] Id.
[20] Id. at 11.

h. continued risk to their PII—which remains in Defendant's possession—and is thus at risk for future breaches so long as Defendant fails to take appropriate measures to protect the PII.

***Substantially Increased Risk of Identity Theft and Fraud***

59. Plaintiff and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

60. Federal regulations define identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201(b)(9).

61. Those regulations describe identifying information as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including names, Social Security numbers, dates of birth, government-issued identification numbers, and other identifying data. Id. § 248.201(b)(8).

62. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal individuals' personal data to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market (aka the Dark Web) to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

63. The "Dark Web" is an unindexed layer of the internet that requires special software or authentication to access.[21] Criminals in particular favor the Dark Web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, Dark Web users need to know the web address of the website they wish to visit in advance. For example, on

---

[21] What Is the Dark Web?, Experian, https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited July 9, 2025).

the surface web, the CIA's web address is cia.gov, but on the Dark Web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[22] This prevents Dark Web marketplaces from being easily monitored by authorities or accessed by those not in the know.

64. On information and belief, the PII of Plaintiff and Class Members has been exposed to sale on the Dark Web because cybercriminals monetize stolen identifying information. In addition, detailed PII may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized persons may repeatedly use and disseminate the compromised information.

65. Theft of Social Security numbers also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to demonstrate ongoing harm from misuse of their SSN, and a new SSN will not be provided until after the victim has suffered the harm.

66. In particular, the theft of Social Security numbers—in combination with other PII (e.g., name, address, date of birth)—provides cybercriminals with a "skeleton key" to commit rampant fraud and identity theft.

67. For example, cybersecurity expert Jim Stickley explained to Time Magazine that "[i]f I have your name and your Social Security number, and you haven't gotten a credit freeze yet, you're easy pickings . . . With that, you can do whatever you want . . . You can become that

---

[22] Id.

person."[23] For context, Jim Stickley is a "penetration tester" who is employed by businesses "to infiltrate their systems in order to find flaws they can fix before the bad guys exploit them."[24]

68. There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt collection calls commence months, or even years, later. An individual may not know that their Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

69. For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[25]

70. It is within this context that Plaintiff and all other Class Members must now live with the knowledge that their PII is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

71. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take

---

[23] Patrick L. Austin, 'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say, Time Magazine (Aug. 5, 2019) https://time.com/5643643/capital-one-equifax-data-breach-social-security/.
[24] Id.
[25] John W. Coffey, Difficulties in Determining Data Breach Impacts, 17 J. Systemics, Cybernetics & Informatics 9 (2019) http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

72. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

73. Identity thieves can also use an individual's personal data and PII to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name.[26]

74. One example of criminals piecing together bits and pieces of compromised PII to create comprehensive dossiers on individuals is called "Fullz" packages.[27] These dossiers are both

---

[26] Identity Theft and Your Social Security Number, Social Security Administration, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf. (last visited July 9, 2025).

[27] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone

shockingly accurate and comprehensive. With "Fullz" packages, cybercriminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. For example, they can combine the stolen PII with unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

75. The development of "Fullz" packages means that the PII exposed in the Data Breach can easily be linked to data of Plaintiff and the Class that is available on the internet. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cybercriminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. On information and belief, such misuse of stolen PII explains the spam calls and texts Plaintiff experienced following the Data Breach and the continuing risk to Plaintiff and Class Members.

76. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[28]

---

with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. See, e.g., Brian Krebs, Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

[28] 2019 Internet Crime Report (Feb. 11, 2020) Federal Bureau of Investigation, https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited July 9, 2025).

77. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Yet, Defendant failed to rapidly report to Plaintiff and the Class that their PII was stolen. Defendant's failure to promptly and properly notify Plaintiff and Class Members of the Data Breach exacerbated Plaintiff's and Class Members' injuries by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

78. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

79. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

80. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiff and Class Members will need to remain vigilant for years or even decades to come.

***Defendant Knew—Or Should Have Known—of the Risk of a Data Breach***

81. Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

82. In 2024, 3,158 data breaches occurred—exposing approximately 1,350,835,988 sensitive records (i.e., a 211% increase year over year).[29]

83. Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack.[30]

84. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

***Defendant Could Have Prevented the Data Breach***

85. Data breaches are preventable.[31] Indeed, the American Bar Association published a treatise titled the *Data Breach and Encryption Handbook* wherein the author explained that:

a. "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[32]

b. "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[33]

c. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs."[34]

---

[29] 2024 Data Breach Report, Identity Theft Resource Center (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.
[30] Ben Kochman, FBI, Secret Service Warn of Targeted Ransomware, Law360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.
[31] Lucy L. Thomson, Despite the Alarming Trends, Data Breaches Are Preventable, Data Breach and Encryption Handbook (2012).
[32] Id. at 17.
[33] Id. at 28.
[34] Id.

***Defendant Failed to Follow FTC Guidelines***

86. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

87. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[35] The FTC declared that, *inter alia*, businesses must:

a. protect the personal customer information that they keep;

b. properly dispose of personal information that is no longer needed;

c. encrypt information stored on computer networks;

d. understand their network's vulnerabilities; and

e. implement policies to correct security problems.

88. The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

89. Furthermore, the FTC explains that companies must:

a. not maintain information longer than is needed to authorize a transaction;

b. limit access to sensitive data;

c. require complex passwords to be used on networks;

d. use industry-tested methods for security;

[35] Protecting Personal Information: A Guide for Business, Fed Trade Commission (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_protecting-personal-information.pdf.

e. monitor for suspicious activity on the network; and

f. verify that third-party service providers use reasonable security measures.

90. The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

91. In short, Defendant's failure to use reasonable and appropriate measures to protect against unauthorized access to its employees and former employees' data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendant Failed to Follow Industry Standards***

92. Several best practices have been identified that—at a minimum—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

93. Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

94. Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR.DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

95. These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

## CLASS ACTION ALLEGATIONS

96. Plaintiff brings this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> All individuals residing in the United States whose PII was compromised in the Data Breach involving unauthorized access to USA Waste-Management Resources, LLC's systems between June 17 and September 3, 2026, including all individuals who received notice of that breach (the "Class").

97. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

98. Plaintiff reserves the right to amend the class definition.

99. Plaintiff and Class Members constitute a well-defined community of interest—they are similarly situated persons and were similarly affected and damaged by the alleged conduct of Defendant.

100. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on class-wide bases using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

101. Ascertainability. All members of the proposed Class are readily ascertainable from information in Defendant's custody and control. After all, Defendant already identified some individuals and sent them data breach notices.

102. Numerosity. The Class Members are so numerous that joinder of all Class Members is impracticable. Defendant's regulatory reporting identifies more than 522 affected Iowa residents alone. Upon information and belief, the proposed nationwide Class includes thousands of individuals whose identities can be determined from Defendant's records.

103. Typicality. Plaintiff's claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

104. Adequacy. Plaintiff will fairly and adequately protect the proposed Class's common interests. His interests do not conflict with Class Members' interests. And Plaintiff has retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

105. Commonality and Predominance. Plaintiff's and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class Members—for which a class-wide proceeding can answer for all Class Members. In fact, a class-wide proceeding is necessary to answer the following questions:

a. if Defendant had a duty to use reasonable care in safeguarding Plaintiff's and the Class's PII;

b. if Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. if Defendant was negligent in maintaining, protecting, and securing PII;

d. if Defendant breached contract promises to safeguard Plaintiff and the Class's PII;

e. if Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

f. if Defendant's Breach Notice was reasonable;

g. if the Data Breach caused Plaintiff and the Class injuries;

h. what the proper damages measure is; and

i. if Plaintiff and the Class are entitled to damages and/or injunctive relief.

106. Superiority. A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that individual litigation against Defendant would require. Thus, it would be practically impossible for Class Members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

107. Defendant has acted or refused to act on grounds generally applicable to the Class, making final injunctive relief appropriate under Rule 23(b)(2). Common questions predominate, and class treatment is superior under Rule 23(b)(3). Plaintiff requests certification of the Class, appropriate issue classes or subclasses under Rule 23(c)(4) and (c)(5), and appointment of class counsel under Rule 23(g).

## COUNT I
## Negligence
## (On Behalf of Plaintiff and the Class)

108. Plaintiff incorporates by reference all preceding factual and class allegations as if fully set forth herein.

109. Plaintiff and the Class entrusted their PII to Defendant on the premise and with the understanding that Defendant would safeguard their PII, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

110. Defendant owed a duty of care to Plaintiff and Class Members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII in a data breach. And here, that foreseeable danger came to pass.

111. Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if their PII was wrongfully disclosed.

112. Defendant owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiff and Class Members' PII.

113. Defendant owed—to Plaintiff and Class Members—at least the following duties to:

a. exercise reasonable care in handling and using the PII in its care and custody;

b. implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized disclosure;

c. promptly detect attempts at unauthorized access;

d. notify Plaintiff and Class Members within a reasonable timeframe of any breach to the security of their PII.

114. Thus, Defendant owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiff and Class Members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

115. Defendant also had a duty to exercise appropriate clearinghouse practices to remove PII it was no longer required to retain under applicable regulations.

116. Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

117. Defendant's duty to use reasonable security measures also arose from its undertaking to collect, maintain, and safeguard the confidential PII of Plaintiff and the Class in connection with their employment. Plaintiff and the Class entrusted Defendant with that information for limited employment-related purposes.

118. Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiff and Class Members' PII.

119. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiff and the Class Members' sensitive PII.

120. Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

121. Similarly, Texas Business and Commerce Code § 521.052(a) requires a business to implement and maintain reasonable procedures, including appropriate corrective action, to protect sensitive personal information collected or maintained in the regular course of business from unlawful use or disclosure. Defendant failed to maintain those reasonable safeguards.

122. The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendant holds vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the PII — whether by malware or otherwise.

123. PII is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiff and Class Members and the importance of exercising reasonable care in handling it.

124. Defendant improperly and inadequately safeguarded the PII of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

125. Defendant breached these duties as evidenced by the Data Breach.

126. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and Class Members' PII by:

a. disclosing and providing access to this information to third parties and

b. failing to properly supervise both the way the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

127. Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII of Plaintiff and Class Members which actually and proximately caused the Data Breach and Plaintiff and Class Members' injury.

128. Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class Members' injuries-in-fact.

129. Defendant's regulatory reporting acknowledges that files containing sensitive PII were taken from its environment. On information and belief, Plaintiff's and Class Members' PII was wrongfully accessed and acquired by unauthorized persons because of the Data Breach.

130. As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and Class Members suffered injuries, including loss of privacy and control over their PII, diminution in its value, and lost benefit of their bargain, and face continuing

mitigation costs and lost time. Plaintiff has also lost time addressing the incident and experienced spam calls and texts following the Data Breach.

131. On information and belief, the theft exposed Plaintiff's and Class Members' PII to dissemination, publication, or sale on the Dark Web.

132. Defendant's breach of its common-law duties to exercise reasonable care actually and proximately caused Plaintiff's and Class Members' injuries, including the unauthorized exposure of their PII, loss of confidentiality, lost benefit of their bargain, and the continuing need to protect against identity theft and fraud. Plaintiff and the Class seek damages in an amount to be determined at trial.

**<u>COUNT II</u>**
**Negligence Per Se**
**(On Behalf of Plaintiff and the Class)**

133. Plaintiff incorporates by reference all preceding factual and class allegations as if fully set forth herein.

134. Plaintiff pleads negligence per se in the alternative and requests adoption of the applicable statutory safeguards as the standard of conduct under Texas law. Under Section 5 of the FTC Act, 15 U.S.C. § 45, Defendant was required to avoid unfair practices in its handling and security of sensitive PII.

135. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiff and the Class Members' sensitive PII.

136. Defendant breached its respective duties to Plaintiff and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII.

137. Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

138. The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and members of the Class.

139. But for Defendant's wrongful and negligent breach of its duties owed, Plaintiff and Class Members would not have been injured.

140. The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew or should have known that Defendant was failing to meet its duties and that its breach would cause Plaintiff and members of the Class to suffer the foreseeable harms associated with the exposure of their PII.

141. Texas Business and Commerce Code § 521.052(a) likewise requires Defendant to implement and maintain reasonable procedures to protect sensitive personal information from unlawful use or disclosure. Defendant violated that requirement by failing to maintain reasonable safeguards for the PII at issue. Plaintiff and Class Members are within the class of persons the

requirement is designed to protect, and the exposure of their sensitive information and resulting injuries are the harms it is designed to prevent.

142. Defendant's violations of these statutory safeguards constitute negligence per se. The same conduct also establishes the failure to exercise ordinary care alleged in Count I.

143. As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**COUNT III**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

144. Plaintiff incorporates by reference all preceding factual and class allegations as if fully set forth herein.

145. Plaintiff and Class Members entered into implied contracts with Defendant in connection with their employment and Defendant's collection and maintenance of their PII.

146. Plaintiff and Class Members were required to provide their PII to Defendant as a condition of employment. They provided their PII and labor in exchange for compensation and Defendant's undertaking to safeguard the information necessary to administer that employment.

147. Plaintiff and Class Members reasonably understood that a portion of the funds derived from their labor would be used to pay for adequate cybersecurity measures.

148. Plaintiff and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

149. Plaintiff and Class Members accepted Defendant's offers by providing their PII and labor in exchange for employment, compensation, and the promised protection of their confidential information.

150. In turn, and through internal policies, Defendant agreed to protect and not disclose the PII to unauthorized persons.

151. Defendant's acknowledgment that it is responsible for safeguarding information is consistent with the data-protection undertaking implicit in its collection and continued retention of Plaintiff's and Class Members' PII.

152. Implicit in the parties' agreement was that Defendant would provide Plaintiff and Class Members with prompt and adequate notice of all unauthorized access and/or theft of their PII.

153. After all, Plaintiff and Class Members would not have entrusted their PII to Defendant in the absence of such an agreement with Defendant.

154. Plaintiff and the Class fully performed their obligations under the implied contracts with Defendant.

155. The parties' implied agreements required Defendant to perform its data-protection undertaking in good faith and to preserve the benefit of the agreed exchange by safeguarding the confidential information entrusted to it.

156. Defendant materially breached the contracts it entered with Plaintiff and Class Members by:

a. failing to safeguard their information;

b. failing to notify them promptly of the intrusion into its computer systems that compromised such information.

c. failing to comply with industry standards;

d. failing to comply with the legal obligations necessarily incorporated into the agreements; and

e. failing to ensure the confidentiality and integrity of the electronic PII that Defendant created, received, maintained, and transmitted.

157. In these and other ways, Defendant failed to perform the data-protection obligations it undertook as part of the parties' implied agreements.

158. Defendant's material breaches were the direct and proximate cause of Plaintiff's and Class Members' injuries (as detailed *supra*).

159. On information and belief, Defendant's failures exposed Plaintiff's and Class Members' PII to dissemination, publication, or sale on the Dark Web.

160. Plaintiff and Class Members performed as required under the relevant agreements, or such performance was waived by Defendant's conduct.

## COUNT IV
**Intrusion upon Seclusion**
**(On Behalf of Plaintiff and the Class)**

161. Plaintiff incorporates by reference all preceding factual and class allegations as if fully set forth herein.

162. Plaintiff and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

163. Defendant owed a duty to its employees and former employees, including Plaintiff and the Class, to keep this information confidential.

164. The unauthorized acquisition (i.e., theft) by a third party of Plaintiff and Class Members' PII is highly offensive to a reasonable person.

165. The intrusion was into a place or thing which was private and entitled to be private. Plaintiff and the Class disclosed their sensitive and confidential information to Defendant, but did so privately, with the intention that their information would be kept confidential and protected

from unauthorized disclosure. Plaintiff and the Class was reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

166. On information and belief, Defendant knowingly permitted unauthorized access to Plaintiff's and Class Members' confidential PII despite its knowledge of the inadequacy of its safeguards and the risk demonstrated by its prior breach. That conduct intentionally interfered with Plaintiff's and Class Members' private affairs in a manner highly offensive to a reasonable person.

167. On information and belief, Defendant acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate. Its prior breach and the sensitive nature of the information it retained placed it on notice of the consequences of allowing unauthorized access.

168. Defendant acted with a knowing state of mind when it failed to notify Plaintiff and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

169. Acting with knowledge, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiff and the Class.

170. As a proximate result of Defendant's acts and omissions, the private and sensitive PII of Plaintiff and the Class was stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiff and the Class to suffer damages (as detailed *supra*).

171. On information and belief, the intrusion exposed Plaintiff's and Class Members' PII to dissemination, publication, or sale on the Dark Web.

172. Unless and until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their PII are still maintained by Defendant with their inadequate cybersecurity system and policies.

173. Plaintiff and the Class have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard the PII of Plaintiff and the Class.

174. In addition to injunctive relief, Plaintiff, on behalf of himself and the other Class Members, also seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

## COUNT V
## Unjust Enrichment
## (On Behalf of Plaintiff and the Class)

175. Plaintiff incorporates by reference all preceding factual and class allegations as if fully set forth herein.

176. This claim is pleaded in the alternative to the breach of implied contract claim.

177. Plaintiff and Class Members conferred a benefit upon Defendant. Defendant benefited from using their PII to facilitate employment and from using their labor to derive revenue and profit.

178. Defendant appreciated or had knowledge of the benefits it received from Plaintiff and Class Members.

179. Plaintiff and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

180. Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII.

181. Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

182. Under principles of equity and good conscience, Defendant should not be permitted to retain the benefits obtained at Plaintiff's and Class Members' expense through its use of their PII and labor while failing to provide the reasonable protection of their PII that formed part of the exchange.

183. Plaintiff and Class Members have no adequate remedy at law.

184. Defendant should be compelled to disgorge into a common fund—for the benefit of Plaintiff and Class Members—all unlawful or inequitable proceeds that it received because of its misconduct.

**COUNT VI**
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiff and the Class)**

185. Plaintiff incorporates by reference all preceding factual and class allegations as if fully set forth herein.

186. By undertaking custody and guardianship of Plaintiff's and Class Members' highly confidential PII throughout their employment and thereafter, Defendant assumed a position of trust concerning that information. Plaintiff and Class Members entrusted Defendant to act for their benefit within the scope of that undertaking: to safeguard their PII, timely notify them of a breach

or unauthorized disclosure, and maintain complete and accurate records of the information Defendant stored.

187. Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of Defendant's relationship with them—especially to secure their PII.

188. Because of the highly sensitive nature of the PII, Plaintiff and Class Members would not have entrusted Defendant, or anyone in Defendant's position, to retain their PII had they known the reality of Defendant's inadequate data security practices.

189. Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to sufficiently encrypt or otherwise protect Plaintiff's and Class Members' PII.

190. Defendant also breached its fiduciary duties to Plaintiff and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

191. As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**REQUEST FOR INJUNCTIVE RELIEF**

192. In the fallout of the Data Breach, an actual controversy has arisen about Defendant's duties to use reasonable data security. On information and belief, Defendant's safeguards remain inadequate and unreasonable. Plaintiff and Class Members continue to suffer injury from the loss of control over their PII and the ongoing threat of further unauthorized access, fraud, and identity theft.

193. The Court should issue injunctive relief requiring Defendant to use adequate security consistent with industry standards to protect the PII entrusted to it.

194. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendant experiences another data breach.

195. If another breach occurs, Plaintiff and the Class will lack an adequate remedy at law because many resulting injuries are not readily quantified in full, and they will be forced to bring multiple lawsuits to rectify the same conduct. Monetary damages cannot restore the confidentiality of exposed PII or cover the full extent of their injuries.

196. If an injunction is not issued, the resulting hardship to Plaintiff and Class Members far exceeds the minimal hardship that Defendant could experience if an injunction is issued.

197. An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiff, Class Members, and the public at large.

## PRAYER FOR RELIEF

Plaintiff and Class Members respectfully request judgment against Defendant and that the Court enter an order:

a. Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing his counsel to represent the Class;

b. Awarding injunctive relief as necessary to protect the interests of Plaintiff and the Class;

c. Enjoining Defendant from further unfair and/or deceptive practices;

d. Awarding Plaintiff and the Class compensatory and other actual damages, and exemplary damages where authorized by law, in an amount to be determined at trial;

e. Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

f. Awarding attorneys' fees and costs, as allowed by law;

g. Awarding prejudgment and post-judgment interest, as provided by law;

h. Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

i. Granting other relief that this Court finds appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial for all claims so triable.

Dated: November 17, 2026

Respectfully submitted,

By: *<u>/s/ Camile Alvarez</u>*

Camile Alvarez (SBN 24148788)
STRAUSS BORRELLI PLLC
One Magnificent Mile
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
calvarez@straussborrelli.com

*Attorneys for Plaintiff and the Proposed Class*